IN THE UNITED STATES DISTRICT COURT
DISTRICT OF KANSAS

| | |
|---|---|
| JENNIFER MADRIGAL,            ) | |
|             ) | |
|        Plaintiff,   ) | |
| v.             ) | |
|             ) | |
| WESTWOOD VIEW ELEMENTARY,  ) | |
| 8200 W. 71st Street      ) | |
| Shawnee Mission, KS 66204   ) | Case No. 2:19-cv-02472 |
|             ) | |
|             ) | |
| and           ) | |
|             ) | |
| UNIFIED SCHOOL DISTRICT NO. 512  ) | |
|   known as       ) | |
| SHAWNEE MISSION SCHOOL DISTRICT,  ) | |
| 8200 W. 71st Street      ) | |
| Shawnee Mission, KS 66204   ) | |
|             ) | REQUEST FOR JURY TRIAL |
|      Defendants.  ) | |

## COMPLAINT

COMES NOW Plaintiff Jennifer Madrigal ("Plaintiff"), by and through her undersigned attorney, and for her Complaint against Defendants Westwood View Elementary, Shawnee Mission School District, and Shawnee Mission Board of Education (hereinafter, collectively, "Defendants") alleges and states as follows:

### Parties and Jurisdiction

**1.**    Plaintiff is a citizen of the United States, residing in Johnson County, Kansas and, at all times pertinent to this Complaint for Damages, was an "employee" within the meaning of the Americans with Disabilities Act, 42 U.S.C. § 12101 *et seq.* ("ADA") as amended.

**2.**    Defendant Westwood View Elementary is, and at all times pertinent to this Complaint for Damages, was an "employer" within the meaning of the ADA.

1

3.     Defendant Unified School District No. 512 known as Shawnee Mission School District (hereinafter "Defendant District") is, and at all times pertinent to this Complaint for Damages, was an "employer" within the meaning of the ADA.

4.     This is an employment discrimination and retaliation lawsuit based upon and arising under the ADA.

5.     All of the unlawful acts and practices set forth below were committed within Johnson County, Kansas. Jurisdiction and venue are proper in the District of Kansas pursuant to 28 U.S.C. § 1331 and 28 U.S.C. § 1391.

## Administrative Procedure and Procedural Posture

6.      On or about July 24, 2018, Plaintiff timely filed a Charge of Discrimination against Defendants dually with the Equal Employment Opportunity Commission ("EEOC") and the Kansas Human Rights Commission ("KHRC") on the basis of Plaintiff's daughter's disability and/or perceived disability, and for retaliation; upon filing the EEOC sent Plaintiff two copies, with different file stamp numbers. (File stamped copies are attached as Exhibit A and Exhibit B and incorporated by reference as if fully set forth herein).

7.      On May 17, 2019, the United States Department of Justice Civil Rights Division mailed to Plaintiff Notices of Right to Sue (attached as Exhibit C and Exhibit D and incorporated by reference as if fully set forth herein).

8.      The aforesaid Charge of Discrimination provided the EEOC sufficient opportunity to investigate the full scope of the controversy between the parties and, accordingly, the sweep of this judicial complaint may be and is as broad as the scope of an EEOC investigation of Plaintiff's claims and the involved parties, which could reasonably be expected to have grown out of the Charge of Discrimination.

9.     Through the filing of Plaintiff's Charge of Discrimination, Defendants were afforded notice of Plaintiff's claims and the opportunity to participate in voluntary compliance.

10.     Plaintiff has satisfied all private, administrative and judicial prerequisites to the institution of this action.

### General Allegations Common to All Counts

11.     Plaintiff was an employee of Defendants from approximately August of 2015 until approximately May 29, 2018, when Plaintiff was terminated.

12.     Plaintiff was employed by Defendants as an art teacher.

13.     When Plaintiff first began working for Defendants, Plaintiff was hopeful that Plaintiff's daughters would be able to transfer to Westwood so that they could attend the same school where Plaintiff taught and be closer to Plaintiff.

14.     Plaintiff saw that many other teachers at Westwood also had their children attend school there.

15.     One of Plaintiff's daughters, has a chromosome disorder which affects her major life activities including speaking, communicating, self-care, and learning.

16.     When Plaintiff asked the school's principal, and Plaintiff's supervisor, Kathy Keith (hereinafter "Keith"), if Plaintiff's daughters could transfer to Westwood in 2016, Keith said no.

17.     Plaintiff asked again in 2017, and once again Keith said no.

18.     In 2017, after speaking to other teachers, Plaintiff found out that the transfer policy allowed a transfer if spots were available, which they were.

19.     In or around August of 2017, Plaintiff was thrilled to find out that Plaintiff's daughters, would be transferring to Westwood.

**20.**     Once Plaintiff informed Keith about this, Plaintiff could tell immediately that Keith was upset about Plaintiff's daughter's transfer.

**21.**     Keith knew about Plaintiff's daughter's disability because Plaintiff had discussed it with Keith and it became clear to Plaintiff that Keith did not want Plaintiff's daughter to transfer to Westwood because of Plaintiff's daughter's disability.

**22.**     After being notified of Plaintiff's daughter's transfer, Keith's demeanor towards Plaintiff immediately and permanently changed and Keith became extremely critical of everything that Plaintiff did.

**23.**     Prior to Plaintiff's daughter's transfer, no complaints from Keith or anyone else had been made about Plaintiff or Plaintiff's teaching performance.

**24.**     During Plaintiff's time at Westwood prior to this transfer, Plaintiff received positive evaluations and feedback from parents and other teachers.

**25.**     On or around August 28, 2017, Keith began haranguing Plaintiff for Plaintiff's use flex hours, asking if Plaintiff knew that "Plaintiff hours were from 7:50 to 1:12 only."

**26.**     Plaintiff thought this seemed odd because the previous school year (the year before Plaintiff moved Plaintiff's daughters), Keith had discussed flex hours with Plaintiff and another teacher and gave them permission to use these if needed.

**27.**     Plaintiff approached the other teacher and asked if it was still that teacher's understanding that they could use flex hours, and the other teacher told Plaintiff that the policy had not changed for her and that she was still actively using flex hours.

**28.**     Keith also berated Plaintiff for picking up another teacher's class.

4

29.     Picking up another teacher's class was a common practice at the school; other teachers did this frequently, and Plaintiff did so before Plaintiff's daughter's transfer without any complaint or criticism from Keith.

30.     This treatment made Plaintiff feel like Keith had decided to impose separate and distinct rules that applied to no one at the school but Plaintiff because of Plaintiff association with Plaintiff's daughter, a person with a disability.

31.     On October 23, 2017, Plaintiff sent Keith an email letting her know that several staff/coworkers had asked Plaintiff in passing what they could do to help Plaintiff's nephew who was battling cancer and Plaintiff asked Keith if Plaintiff could send out an email identifying ways staff and coworkers could help.

32.     Plaintiff included a copy of the email Plaintiff was requesting to send in this correspondence.

33.     Keith ignored Plaintiff's email and never replied or granted Plaintiff permission to send out the correspondence.

34.     Keith allowed other staff members to send similar emails selling girl scout cookies, for band camp, or selling other products.

35.     Upon information and belief, Keith did not give Plaintiff permission to send out the message because of Plaintiff's association with her daughter, a person with a disability.

36.     In October of 2011, Keith also stopped calling Plaintiff by Plaintiff's first name and began calling Plaintiff "Ms. Madrigal" while continuing to call other teachers by their first names.

37.     Plaintiff believed she was singled out in this way because of Plaintiff's association with Plaintiff's daughter.

**38.**     On or about September 25, 2017, Plaintiff attended a meeting with Keith about a recent observation Keith had completed of Plaintiff's classroom.

**39.**     In the meeting, Keith asked Plaintiff what Plaintiff thought of the class Keith had recently observed.

**40.**     Plaintiff told Keith that Plaintiff thought it was a great class, that Plaintiff was excited about what the students were working on, and that the students were all on task and we were getting lots accomplished.

**41.**     Keith informed Plaintiff that was not what Keith saw, and she presented numerous critiques about the class.

**42.**     Keith's critiques were inconsistent with what Plaintiff had observed because the class appeared to Plaintiff to go very well.

**43.**     Keith stated that she saw two girls talking about a movie they had seen.

**44.**     Plaintiff asked Keith if the girls were working and Keith said that was not the point and that the student's conversation should always be on task.

**45.**     Plaintiff reminded Keith that in art class students were allowed to talk while they worked, as long as they were completing the assigned task, which was a practice across the district.

**46.**     Keith insisted that Plaintiff needed to manage the conversations of each student and said that if Plaintiff's classroom management skills were not up to the task that Plaintiff should seek help for this.

**47.**     When Plaintiff asked Keith how Plaintiff should address controlling what students say or discuss, she was unable to offer a solution for Plaintiff to implement.

48.     Keith also critiqued Plaintiff about several boys who were using iPads and Plaintiff explained to her that they were using a district-approved pottery app.

49.     Keith then reprimanded Plaintiff for the fact that chalk pastels where out on another table with iPads.

50.     Plaintiff explained to Keith that some students were still working on their assignment, and they were using the iPads to look at what they were drawing with chalk pastels.

51.     In response, Keith told Plaintiff that this was no longer allowed, and that she did not want iPads in art unless it was only pencil and paper research.

52.     Plaintiff did to know why these strict requirements were being placed on Plaintiff's classroom and Plaintiff asked if something had happened, but Keith said it had not.

53.     Plaintiff explained to Keith that Plaintiff had rules in place for the iPads and that in three years the children had not had any incidents with the iPads.

54.     Plaintiff also explained that in Plaintiff's experience, the students has done a great job with the iPads in art and that it was an instrumental tool in teaching and in meeting standards.

55.     Keith told Plaintiff that Plaintiff would have to find different ways to meet those standards.

56.     Prior to this, Plaintiff had received recognition from other teachers around the district for how well Plaintiff integrated iPads into Plaintiff's lessons and others had requested copies of Plaintiff's lesson plans.

57.     There was no valid reason for Keith to single out Plaintiff with these requirements because other art rooms used iPads the same way Plaintiff did, and because Keith allowed iPads at lunch time surrounded by food.

58.     Also, at one point, Plaintiff walked into a classroom and saw a teacher who had iPads out with watercolor paints.

59.     Plaintiff asked the teacher if she was allowed to do this and she responded, "why wouldn't I be able to?"

60.     This made it clear to Plaintiff that Plaintiff was being singled out and treated differently than other teachers.

61.     Plaintiff was also aware of other instances where students were allowed to have iPads out with art supplies and another teacher informed Plaintiff that Keith came into her room and saw this frequently and never said anything.

62.     Also at the September 25, 2017 meeting about Keith's classroom observation of Plaintiff, Keith told Plaintiff that she had serious concerns about Plaintiff meeting Plaintiff's goals.

63.     Keith also told Plaintiff that Plaintiff was no longer allowed to have Plaintiff's phone out during school hours because Keith said she saw Plaintiff on a phone call during class time.

64.     Plaintiff had not been on a phone call, she had been using her phone to look up the school address and other information to write on the board for students entering a contest.

65.     It was common for teachers at Westwood View Elementary to use their phones for reasons such as this during school hours.

66.     Plaintiff never made a personal call in Plaintiff classroom.

67.     Plaintiff informed Keith that Plaintiff was using Plaintiff phone in this way, but Keith still told Plaintiff that Plaintiff could no longer have her phone out.

68.    Upon information and belief, no other teacher was told they could no longer use their phone except for Plaintiff.

69.    Plaintiff reported this treatment on or about September 26, 2018 to Lachelle Sigg in Human Resources and told Sigg that Plaintiff felt that she was being treated this way because of her disabled daughter.

70.    When Plaintiff said this, Sigg laughed and stated, "My principals don't discriminate."

71.    Plaintiff felt like Sigg was extremely dismissive of Plaintiff's complaints and implied that Plaintiff had no basis to be making these complaints and that Plaintiff did not know what Plaintiff was talking about.

72.    Sigg suggested that the first step would be meeting in person with Keith, but this made Plaintiff feel very uncomfortable.

73.    Sigg also stated in an email about filing a formal complaint that "I am in no way suggesting you should or should not file a complaint" and Sigg's email and dismissive attitude discouraged Plaintiff from filing a formal complaint at that time.

74.     Just a few days later, on or about September 28, 2017, Plaintiff received an angry email from Keith regarding Plaintiff's daughter's support on field trips.

75.    Keith instructed Plaintiff that she was not allowed to discuss Plaintiff's daughter Plaintiff's daughter and her needs with anyone at the school other than Keith, Mrs. McGill and Mrs. Waeckerle.

76.    Keith claimed it was unprofessional for Plaintiff to discuss this with any other members of school faculty.

77.    This email was very upsetting to Plaintiff because it referred to an innocent conversation when Plaintiff's daughter's paraprofessional sat down with Plaintiff at lunch one day and there had been nothing inappropriate about the conversation.

78.    The paraprofessional began asking Plaintiff about Plaintiff's daughter and Plaintiff told her that in the past Plaintiff had gone on field trips with Plaintiff's daughter to help her teacher because Plaintiff's daughter often wandered off during field trips and that Plaintiff could no longer do that because of her current job.

79.    The paraprofessional remarked that maybe she could attend field trips with Plaintiff's daughter and that she would inquire about that.

80.    In Keith's email, Keith discouraged Plaintiff from inquiring about services for Plaintiff's daughter stating that "I assure you that I have personally reviewed Plaintiff's daughter's IEP and I am confident that we are meeting her goals."

81.    The email also implied that Plaintiff was having trouble working and parenting in the same environment as Plaintiff's child, which was not true.

82.    Before this time, Plaintiff have never heard of such a rule for other teachers whose children attended the school.

83.    On or about October 4th, 2018, Keith observed Plaintiff's classroom again.

84.    On October 6, 2017 Keith met with Plaintiff about this observation and asked Plaintiff to add a goal for classroom management to Plaintiff yearly goals.

85.    In Plaintiff's experience, it was unusual for Keith to observe a classroom so frequently.

86.    At this meeting, Keith stated the volume was too loud in Plaintiff class.

87.     Plaintiff invited Keith to come by Plaintiff's class the following Monday so they could figure out what an acceptable noise level was for the classroom.

88.     During the meeting Keith agreed to do so, but on Monday she did not come.

89.     Keith also cited Plaintiff for a five-year-old student telling another student that his "butt stinks," a comment which Plaintiff did not hear.

90.     Plaintiff was also cited for students being "off topic" even though Plaintiff reminded her that students could speak freely as long as they were completing the task at hand, which was the generally accepted rule for art classes in the district.

91.     Keith also critiqued Plaintiff for being "off topic" when Plaintiff spoke to one five-year old student about their birthday and spoke to another student who was crying about missing their parents.

92.     All of these criticisms seemed to Plaintiff at the time to be completely unreasonable and unrelated to any legitimate pedagogical goal.

93.     On or around October 10, 2017, Keith stated she had received a complaint about Plaintiff from one of the parents, Emily Hess, regarding the makerspace technology and she needed to meet with Plaintiff about it.

94.     Plaintiff was surprised by this and Plaintiff reached out to Emily to apologize.

95.     When Plaintiff did, Hess seemed surprised and replied that she was not upset at all and apologized for the misunderstanding. She stated that she was simply interested in learning how the makerspace technology worked and what the art class had been doing in general.

96.     It was natural for Hess to be interested in this because she worked for the Kansas City Art Institute.

97.     Upon information and belief, Keith manufactured this complaint from Hess' inquiry as a pretext to discipline and eventually terminate Plaintiff and did this because of Plaintiff association with Plaintiff's daughter, a person with a disability.

98.     Because Plaintiff was being singled out, she contacted the National Education Association ("NEA"), the teacher's union, reported this treatment to them, and requested their assistance.

99.     On or about October 23, 2017, Keith called Plaintiff into a meeting about the purported "complaint" by Emily (the parent Plaintiff had contacted).

100.    Keith seemed very angry that Plaintiff had brought an NEA representative with her, stating that the meeting could have been handled without them and suggesting Plaintiff was making too big of a deal about the meeting.

101.    Keith also stated again during this meeting that after Plaintiff's observation she felt like Plaintiff would not meet Plaintiff goals.

102.    In response, the union representative, Linda Seick, suggested that Keith move forward Plaintiff's formal observation to allow Keith to provide information for areas she thought Plaintiff needed to improve and to give Plaintiff time to meet Keith's demands.

103.    On October 26, 2017, Plaintiff contacted Seick and asked if it was time to address Keith's discrimination for Plaintiff's daughter Plaintiff's daughter attending Westwood.

104.    Seick discouraged Plaintiff from doing this because of the fear of retaliation by Keith.

105.    On or around November 16, 2017, Keith scheduled Plaintiff's formal review and marked Plaintiff negatively, despite the fact that the class Keith observed went very well.

106.    Plaintiff informed Seick that Plaintiff was having the same concerns as before about Keith's discrimination, but Plaintiff was again discouraged from bringing this up because of fear of additional retaliation by Keith.

107.    In response to Keith's demands, Plaintiff did everything Plaintiff could to comply with Keith's directions.

108.    Plaintiff worked with Ali Bivona, Defendant's instructional coach, to develop an iPad space in Plaintiff's classroom and Plaintiff worked tirelessly on implementing every piece of feedback.

109.    According to others who observed Plaintiff's class, Plaintiff was doing a great job.

110.    Despite this, Keith continued to review Plaintiff negatively and to find fault with Plaintiff's teaching and her classroom.

111.    In approximately December of 2017, Keith visited Plaintiff's room while Plaintiff was teaching sixth grade.

112.    Keith was looking at student art being displayed in Plaintiff's classroom and Keith inquired about one student's work in particular, asking Plaintiff several questions about it and claiming that it was inappropriate.

113.    At that point Plaintiff's class was starting to get bored waiting on Plaintiff, so she asked Keith if she could get back to them and Keith left, taking the art with her.

114.    Plaintiff visited Keith's office the next morning before school to see what came of the situation.

115.    Keith told Plaintiff that another teacher and a counselor saw what Keith was talking about, and that Plaintiff must be messing around with her.

116.    Keith wanted Plaintiff stare at the art only in a certain way and Keith positioned it the way she wanted Plaintiff to look at it.

117.    When Plaintiff did not see anything, Keith was extremely frustrated and said Plaintiff was being difficult.

118.    Keith stated that a representation of an outstretched arm was a phallus and accused Plaintiff of intentionally letting the child make phallic art.

119.    Keith stated that others saw it and so that must be what it was.

120.    Plaintiff was shocked as she knew that was not what the child intended and the child had no history of making inappropriate art.

121.    In fact, the student was very excited about this project because it was of one of his favorite characters and Plaintiff had been proud of his ability to finish this artwork (as the student had been a struggle in the past).

122.    The other teacher that Keith claimed saw the phallus told Plaintiff that if she was just looking at the art without Keith pointing it out, she would not have seen anything inappropriate.

123.    The counselor also stated that she too did not see anything at first until Keith pressed and presented it as a phallus.

124.    The counselor laughed it off at that time, thinking it was strange, but never once doubting Plaintiff's classroom management or Plaintiff's morals.

125.    Keith emailed Plaintiff later stating that she had called the student's mother to come get the project and that it would not be allowed in the art fair and questioning why Plaintiff had not directed the child to correct the art.

**126.**   The parents of the child were shocked by Keith's accusations and they found it absurd that Keith thought their child would create phallic art.

**127.**   They were angry and felt that Keith was sexualizing their child.

**128.**   In fact, the father of the child was so upset by Keith's suggestion that he broke the arm off of the sculpture in front of Keith.

**129.**   Upon information and belief, Keith accused Plaintiff of intentionally encouraging the student to create phallic art so that Keith would have a pretext to reprimand and terminate Plaintiff because of Plaintiff's association with her daughter, a person with a disability.

**130.**    On or around December 4, 2017, Keith informed Plaintiff that Keith did not believe that Plaintiff would meet one of Plaintiff's performance goals.

**131.**   Plaintiff asked Keith several times by email what this meant but Keith did not respond.

**132.**   On or about December 13, 2017, Plaintiff again requested to meet with Sigg at Human Resources and again reported Keith's discrimination.

**133.**   Plaintiff brought Sigg a timeline of the discrimination Plaintiff had encountered, but Sigg did not even look at the information, she just passed it back to Plaintiff.

**134.**   When Sigg handed it back to Plaintiff, she stated that her principals do not lie, and that Keith could not have gotten as far as she had by discriminating.

**135.**   To Plaintiff's knowledge, Plaintiff's complaint was not investigated or taken seriously by Human Resources.

**136.**   Plaintiff left this meeting in tears because Plaintiff knew that Human Resources was not going to do anything to help end the discrimination by Keith.

137.    On or about December 15, 2017 Plaintiff again addressed Keith's discrimination with Seik but Seik stated in response that we should consider "the possible consequences" of addressing this discrimination, referring to retaliation by Keith and making it clear that the discrimination would not be addressed.

138.    On or about January 5, 2018, Keith was observing Plaintiff's class and a child was asking great questions during Plaintiff's class, so Plaintiff used it as a teaching moment to answer his questions in front of the class (another common teaching technique used in the district).

139.    Keith later critiqued Plaintiff for letting the child "monopolize" the conversation and said he should be silenced or disciplined for asking questions.

140.    On or about January 17, 2018, Megan Burright, an Instructional coach in the district, observed Plaintiff class.

141.    Afterwards, she gave Plaintiff positive feedback, including that Plaintiff held students accountable, had good classroom management and had a positive classroom culture.

142.    Burright stated that she had learned some great tips observing Plaintiff, including tips on class management and was taking some of those tips back to her classroom.

143.    Burright said that she had a hard time coming up with areas for improvement and the feedback she provided were just some suggestions.

144.    A few months earlier, on or about October 28, 2017, a parent of two students at Westwood also sent Plaintiff an email stating that she had observed Plaintiff class and that Plaintiff had done a great job with the class.

145.     These observations made it clear to Plaintiff that she was performing well in her teaching and class management, and that Keith was picking on Plaintiff and trying to find things wrong with Plaintiff's teaching because of Plaintiff's association with her daughter.

146.     In February of 2018, Plaintiff was at school after hours for a parent teacher conference.

147.     During that meeting, Keith made fun of Plaintiff's disabled daughter, mocking her lack of verbal ability and her almost not making it to the restroom in time.

148.     Keith performed the gestures Plaintiff's daughter makes when she needs to use the restroom and laughed hysterically.

149.     Plaintiff was so upset by this that Plaintiff went to her classroom and cried.

150.     Plaintiff reported Keith's treatment to Plaintiff's union representative as Plaintiff had many times before, but the Union again discouraged Plaintiff from making a report and Plaintiff felt that if Plaintiff reported this, she could lose her job.

151.     It was also clear that HR would do nothing to help Plaintiff and would just say that their principals did not discriminate.

152.     On or about February 12, 2018, Keith informed Plaintiff that she would not renew Plaintiff's contract after marking Plaintiff ineffective on two out of three of the goals from an earlier evaluation.

153.     Keith did this despite the fact that Plaintiff met all of the program expectations Keith had created for Plaintiff.

154.     Plaintiff was devastated by this news and during the bi-weekly meetings leading up to this, Keith had led Plaintiff to believe that Plaintiff was meeting these goals and Keith stated that Plaintiff had made progress.

155.    On approximately February 16, 2018, one of the teachers at Plaintiff's school sent a letter to the NEA which mentioned that she felt like Plaintiff was being retaliated against following Plaintiff's daughter's transfer to the school.

156.    Plaintiff was told that Plaintiff would need to resign by April 13, 2018 or Plaintiff's contract would go to the board for non-renewal.

157.    Because Plaintiff's contract was not renewed, Plaintiff had to look for other teaching jobs.

158.    Plaintiff received many letters of recommendation from teachers at Westwood and from the parents of Plaintiff students as well.

159.    One parent, Lisa Hill, wrote in her recommendation letter, "Ms. Madrigal possesses a warm personality and maintains a good rapport with the students and families."

160.    Sara Trucksess, parent and former PTA president at Westwood, wrote "She is beloved by all three of Plaintiff children who are her students and it is clear that she fosters a great sense of creativity in them."

161.    Additionally, one of the teachers, Brian Quick, wrote, "As good as an art teacher as she is, Mrs. Madrigal is even better at building relationships with her students and fellow staff members."

162.    On approximately March 7, 2018, Plaintiff found that Plaintiff did not get the position Plaintiff had applied for at Roseland School, which had previously been enthusiastic about having Plaintiff work there, until after they spoke to HR.

163.    The contact for the position stated "we are not moving forward with your application request" after she "received clarification from HR."

164.     After speaking with the Roseland contact on the phone, it was clear that Plaintiff was blocked from getting the job because of Plaintiff's complaints and because of Plaintiff's daughter.

165.     In the beginning of April 2018, Plaintiff reached out to Plaintiff's daughter's special education teacher, Jackie Chatman, about Keith's discrimination.

166.     On or about April 9, 2018, Plaintiff also made a formal complaint to Human Resources about the February incident where Keith made fun of Plaintiff's daughter.

167.     Shortly after that, Plaintiff received a response that Plaintiff claims were unfounded. It is clear to Plaintiff that her complaints were not taken seriously and were not investigated.

168.     Plaintiff was terrified of her career being ruined because of Keith's feelings about Plaintiff's daughter's disability.

169.     Plaintiff knew that a non-renewal of a contract could make it much more difficult to get a job.

170.     Because of this, on April 11, 2018, Plaintiff offered her resignation.

171.     However, after thinking about this long and hard, Plaintiff rescinded her resignation on or about April 13, 2018.

172.     Plaintiff felt that she should not be forced out of her job because of Keith's discriminatory treatment towards Plaintiff.

173.     Plaintiff instead requested an investigation into Keith's discrimination against Plaintiff and she sent a letter to the school board as well as Human Resources.

174.     Plaintiff received confirmation on or about April 18, 2018 that Plaintiff's resignation had been rescinded and Plaintiff was informed that the school was recommending

Plaintiff's non-renewal and that the decision would be made by the school board on April 23, 2018.

175.   On or about April 23, 2018, Plaintiff was notified by Terry Wintering that Plaintiff would not be allowed to present Plaintiff's case before the board at their meeting to decide renewal of Plaintiff's contract.

176.   Because Plaintiff was not allowed to speak at this meeting, Plaintiff sent a letter to the school board members explaining to them how much it meant to Plaintiff to be a teacher and how much the students meant to Plaintiff.

177.   Plaintiff explained to them why Plaintiff contract should be renewed, and Plaintiff assembled a packet of positive recommendations and notes from parents and fellow teachers at Westwood.

178.   Plaintiff cited Plaintiff's reviews from past teaching jobs and Plaintiff mentioned that Plaintiff had not had any complaints from parents or from the other teachers.

179.   On or about April 26, 2018, Plaintiff was notified that Plaintiff was not renewed by the board and that Plaintiff would be terminated.

180.   On or about May 23, 2018, Pam from Human Resources informed Plaintiff that her investigation was compete and stated that she found, "no evidence supporting that Ms. Keith treated you or your daughter differently and/or harassed her or you as a result of her attendance at Westwood View."

181.   Plaintiff requested to meet with the Superintendent about this investigation, but he never responded.

182.   Plaintiff's contract was not renewed, and Plaintiff's employment ended on or about May 29, 2018.

183.     After, filing Plaintiff's charge of discrimination, Plaintiff noticed that the care of her daughter began to suffer at Westwood.

184.     Most of the individuals at the school would not speak to Plaintiff about her daughter's care and Plaintiff's daughter began having issues much more frequently such as not making it to the bathroom in time or wandering the halls and not making it to class.

185.     These issues were difficult to address without the ability to have meaningful conversations about Plaintiff's daughter's learning and care.

186.     In October of 2018, the school speech pathologist called Plaintiff to ask if Plaintiff would consider a re-evaluation of Plaintiff's daughter to get her back on an assisted language device.

187.     Plaintiff was surprised to receive this information from her and asked her why she called and not the school psychologist because it is the school psychologist's job to ask for evaluations.

188.     The speech pathologist insinuated that most people at Westwood did not want to speak to Plaintiff because of Plaintiff Charge of Discrimination and that they asked the speech pathologist to call Plaintiff because they had a relationship.

189.     The speech pathologist told Plaintiff the new psychologist (whom Plaintiff have never met), knows all about the Charge of Discrimination and has been talking to people about it in regard to Plaintiff's daughter.

190.     This treatment has affected Plaintiff's daughter's ability to learn and has made things much more stressful for her and for Plaintiff's family.

191.     In June of 2018, Plaintiff received a letter that her daughters would be removed from school but the letter did not say why.

192.    When Plaintiff reached out to Keith inquiring about this, she was told that she was not the person to speak to about it, despite the fact that the letter clearly stated that Keith was the person to speak to about it.

193.    When Plaintiff's husband spoke to Keith about how the lack of good cause for removal of the children from school, the children were finally reinstated.

194.    Upon information and belief, Keith attempted to remove the children from the school because of Plaintiff's complaints of discrimination and because of Plaintiff's daughter's disability but was forced to reinstate the children because she did not have good cause to remove them.

## COUNT I - DISPARATE TREATMENT IN VIOLATION OF THE ADA

195.    Plaintiff hereby re-alleges and incorporates by reference the allegations contained in the above-stated paragraphs.

196.    Plaintiff's daughter is disabled, as defined by the ADA, at all relevant times herein and/or Defendants regarded Plaintiff's daughter as being disabled.

197.    Specifically, Plaintiff's daughter suffers medical conditions which substantially limit her major life activities, including self-care, learning, and communicating. At all relevant times, including prior to Plaintiff's termination, Defendants were aware that Plaintiff's daughter had a record of having such impairment.

198.    Plaintiff's daughter has a disability as defined by the ADA, due to her impairment and/or Defendant's perception that Plaintiff's daughter is disabled.

199.    Plaintiff was qualified for her job.

200.    Defendants knew of Plaintiff's daughter's disability.

201.    Defendants unlawfully and intentionally discriminated against Plaintiff based on her daughter's disability and/or because they regarded her as disabled, and acted in bad faith by interfering with, recklessly disregarding, and denying her legal rights when they terminated Plaintiff's employment.

202.    Defendants' conduct violated the ADA including by Defendants harassment and termination of Plaintiff.

203.    Plaintiff's daughter's disability and/or Defendants perception that Plaintiff's daughter is disabled, was a motivating factor in Defendants decision to terminate Plaintiff's employment.

204.    As a direct and proximate result of Defendants actions and/or omissions, Plaintiff has been deprived of income, as well as other monetary and non-monetary benefits.

205.    As a further direct and proximate result of Defendants actions and/or omissions, Plaintiff has suffered a loss of self-esteem, humiliation, emotional distress and mental anguish and pain, and related compensatory damages.

206.    By failing to take prompt and effective remedial action, Defendants in effect condoned, ratified and/or authorized the discrimination against Plaintiff.

207.    As shown by the foregoing, Defendants conduct was willful, wanton, and malicious, and showed complete indifference to or conscious disregard for the rights of others, including the rights of the Plaintiff, thus, justifying an award of punitive damages in an amount sufficient to punish Defendants or to deter them and other companies from the conduct in the future.

WHEREFORE, Plaintiff requests that the Court enter judgment in her favor and against the Defendants for economic damages, including, but not limited to: back pay, lost benefits, and

front pay, injunctive relief, compensatory damages, punitive damages, for reasonable attorneys' fees and costs incurred herein, for pre- and post-judgment interest as allowed by law, and for such other and further legal and equitable relief as this Court deems just and proper.

### COUNT II - RETALIATION IN VIOLATION OF THE ADA

208.    Plaintiff hereby re-alleges and incorporates by reference the allegations contained in the above-stated paragraphs.

209.    Plaintiff's daughter is disabled and/or Defendants regarded her as disabled, as defined by the ADA, at all relevant times herein.

210.    Plaintiff's daughter is a member of a protected class because of her disability and/or because she was regarded as being disabled, and because she requested an accommodation.

211.    Plaintiff complained of and opposed Defendants' discriminatory treatment when she made informal and formal complaints of discrimination and retaliation to Human Resources because of Plaintiff's daughter's disability.

212.    In retaliation for Plaintiff's complaints Plaintiff was terminated by Defendants.

213.    As a direct and proximate result of the Defendants' actions and/or omissions, Plaintiff has been deprived of income, including wages and benefit as well as other monetary and non-monetary benefits.

214.    As a further direct and proximate result of Defendants' actions and/or omissions, Plaintiff has suffered a loss of self-esteem, humiliation, emotional distress and mental anguish and pain, and related compensatory damages.

215.    By failing to take prompt and effective remedial action, Defendants, in effect condoned, ratified and/or authorized the discrimination against Plaintiff.

216.    As shown by the foregoing, Defendants' conduct was willful, wanton, and malicious, and showed complete indifference to or conscious disregard for the rights of others, including the rights of the Plaintiff, thus, justifying an award of punitive damages in an amount sufficient to punish Defendants or to deter them and other companies from the conduct in the future.

WHEREFORE, Plaintiff requests that the Court enter judgment in her favor and against the Defendants for economic damages, including, but not limited to: back pay, lost benefits, and front pay, injunctive relief, compensatory damages, punitive damages, for reasonable attorneys' fees and costs incurred herein, for pre- and post-judgment interest as allowed by law, and for such other and further legal and equitable relief as this Court deems just and proper.

### Demand for Jury Trial and Designation of Place of Trial

Plaintiff requests a trial by jury, in Kansas City, Kansas, on all matters arising out of this Complaint.

Respectfully Submitted,
EDELMAN, LIESEN & MYERS, L.L.P.

 /s/ Alexander Edelman_____
Alexander Edelman    KS #25821
Sarah C. Liesen         KS #26988
sliesen@elmlawkc.com
208 W. Linwood Blvd.
Kansas City, Missouri 64111
Telephone: (816) 301-4056
Facsimile:  (816) 463-8449

ATTORNEYS FOR PLAINTIFF